UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
:
LOUIS BORRERO,                                                :
:
                               Petitioner,       :
:
                      -v-                                     :
:
UNITED STATES OF AMERICA,                                     :
:
                               Respondent.      :
:
------------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: January 10, 2018

13-cr-0058 (KBF)
17-cv-2834 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

Louis Borrero, currently incarcerated at U.S.P. Canaan, brings a petition under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence. At trial Borrero was convicted by a jury of conspiracy to possess with intent to distribute heroin under 21 U.S.C. §§ 846 and 841(b)(1)(A); conspiracy to commit Hobbs Act robbery under 18 U.S.C. § 1951; and use or carry of a firearm under 18 U.S.C. § 924(c)(1)(A)(i). On February 21, 2014, Borrero was sentenced to 324 months of incarceration.

Borrero, acting pro se,[1] puts forth three bases for his petition: lack of jurisdiction; vagueness under Johnson; and ineffective assistance of counsel. For the reasons set forth below, the petition is DENIED.

---

[1] The Court applies a "liberal construction of [pro se] pleadings, which should be read 'to raise the strongest arguments that they suggest.'" Green v. United States, 260 F.3d 78, 83 (2d Cir. 2001) (quoting Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996)). Nevertheless, a Court may dismiss a petition under § 2255 without directing the United States attorney to file a response or holding an evidentiary hearing if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." Gonzalez v. United States, 722 F.3d 118, 130 (2d Cir. 2013) (quoting 28 U.S.C. § 2255); Fed. R. Governing Sec. 2255 Proceedings for the U.S.D.C. 4(b) ("If it plainly

I. BACKGROUND

On December 14, 2012, a cooperating witness ("CW") told Jancey Valle, a member of a "crew of individuals who rob narcotics traffickers," that a confidential informant ("CI-1") "had information" about the locations of narcotics stashes. (Presentence Investigation Report ("PSR") ¶ 28). This was done at the direction of a case agent and under surveillance. (Id.) Valle responded that Javion Camacho ("Camacho") would be interested in meeting with CI-1, and that Camacho's crew "impersonates police officers, and may include actual police officers." (Id.) Three days later, on December 17, 2012, the CW and CI-1 (at the direction of the Drug Enforcement Agency ("DEA")) met with Valle and Camacho. (Id. ¶ 30.) CI-1 told Camacho that a minimum of ten kilograms of heroin (the "Shipment") would be arriving in New York City and that CI-1 wanted to rob the Shipment. (Id.) Camacho informed CI-1 that he had a "robbery crew of police impersonators who would be able to carry out the robbery" and that he expected to be able to sell the heroin. (Id.) Camacho gave CI-1 a telephone number and told CI-1 to keep him informed about the Shipment. (Id.)

On December 31, 2012, a case agent reviewed text messages exchanged by Camacho and CI-1 that day in which they agreed to meet on January 2, 2013. (Id. ¶ 31.) On January 2, Camacho met CI-1 at a restaurant along with Valle and Julio Camacho, Javion's brother. (Id. ¶ 32.) CI-1 told Camacho that the Shipment would

---

appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion and direct the clerk to notify the moving party."). Here, the petition raises no factual dispute and can thus be resolved without a Government response and/or hearing.

contain between twenty and forty kilograms of heroin; Camacho responded that the crew could "take over Jersey City" with that amount. (Id.) Julio Camacho asked CI-1 whether he would mind if the traffickers expecting the Shipment were "laid out"—killed—during the robbery. (Id.)

On January 8, 2014, Camacho and CI-1 exchanged text messages and planned to meet the next day for the robbery. (Id. ¶ 35.) The next day, Camacho texted CI-1 in preparation about the time and place, and at approximately 8:15 p.m., CI-1 met Camacho at a restaurant. (Id. ¶¶ 36–37.) CI-1 told Camacho and Victor Moral, one of the drivers, that the Shipment contained approximately 20 kilograms of heroin; Camacho told CI-1 "there was a police officer on the robbery crew in case they needed to shoot someone." (Id. ¶¶ 37–38.) Eventually, a number of the co-defendants had arrived at the restaurant. Six cars then left, driving single file toward the destination. Borrero was in a car with Julio Camacho and Joshua Roman. When they reached Lakeview Place, CI-1 called Camacho to tell him that the "spot" was up on the right and that Camacho's car should pull over just before it. (Id. ¶¶ 36–37.) When all six cars had turned right and pulled over, law enforcement approached and placed every individual under arrest. (Id. ¶ 37.)

A search of the car Borrero was in uncovered, inter alia, ski masks. (Id. ¶ 45.) In other cars, the agents uncovered, inter alia, a GPS unit (purportedly to track vehicles used by narcotics traffickers), a firearm holster, and gloves. (Id. ¶ 41.) The car was also equipped with a "mechanized device that, at the direction of the driver, would cover the license plate with a steel plate." (Id. ¶ 42.)

3

Borrero's trial commenced on November 4, 2013.  At trial, information from agents, witnesses, physical evidence, telephone records, and cell-site location data demonstrated that Borrero was present at meetings held by certain members of the robbery crew, and that he was wearing black clothing like most of the crew members.  His telephone records indicated that he spoke with Javion Camacho sixty-nine times and Julio Camacho 135 times between December 29, 2012 and January 9, 2013.  (Id. at ¶ 55.)  On the day of the robbery, he was in telephone contact with Javion Camacho sixteen times.  (Id.)

On November 12, 2013, a jury convicted Borrero on all counts.  At trial, Borrero was represented by John Kaley and Anthony Cecutti.  On December 3, 2013, Borrero submitted a pro se motion to set aside the verdict, for entry of judgment of acquittal, and for a new trial, pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure.  (ECF No. 265.)  In that motion, Borrero asserted, first, that that the evidence admitted against him at trial was legally insufficient, and, second, that he received constitutionally ineffective assistance from his trial counsel.

On February 14, 2014, the Court granted counsel's request to extend the deadline to submit post-trial motions until March 31, 2014.  (ECF No. 341.)  On March 31, 2014, counsel advised the Court that he "d[id] not have any additional or supplement issues to present to the Court," and requested that the Court adjudicate Borrero's previously filed pro se motion.  (ECF No. 380.)  On May 12, 2014, the Court denied Borrero's motion on the merits.  (ECF No. 399.)  On June 19, 2014, the

Court denied Borrero's motion for reconsideration of the May 12, 2014 decision. (ECF No. 434.)

On October 14, 2014, as part of his sentencing submission, Borrero moved, for the first time, to dismiss the Indictment for outrageous government conduct. (ECF No. 478.) That motion was denied and on October 28, 2014, Borrero was sentenced to 324 months' incarceration. At sentencing, Borrero was represented by Glenn Garber.

## II. THE STING OPERATION & THE ABSENCE OF DRUGS IN FACT

### A. Legal Principles

#### 1. Manufactured Jurisdiction

Federal agents are not permitted to "manufacture jurisdiction" in order to prosecute criminal activity "primarily of local concern." United States v. Archer, 486 F.2d 670, 682 (2d Cir. 1973). In other words, federal officers may not "themselves suppl[y] the interstate element and act[] to ensure that an interstate element would be present." Id. (holding that federal jurisdiction may not exist when federal agents provoked interstate calls that would not otherwise have been made).

A sting operation, however, is rarely the "manufacturing" of jurisdiction. Rather, "government creation of the opportunity to commit an offense, even to the point of supplying defendants with materials essential to commit crimes, does not exceed due process limits." United States v. Bout, 731 F.3d 233, 238 (2d Cir. 2013) (quoting United State v. Cromitie, 727 F.3d 194, 219 (2d. Cir. 2013)); see also United States v. Myers, 692 F.2d 823 (2d Cir. 1982) (allowing a sting operations

5

where the Government "produced people with fictitious identities ready to pay bribes to Congressmen [but] the essential conduct of the agents and their paid informant was to see who showed up to take the bribes and videotape them in the act of doing so"). A sting operation does not become the manufacture of jurisdiction simply because an object of the crime, such as narcotics, does not exist in fact; the conspiracy was certainly real.

    2. 21 U.S.C. §§ 841 and 846

Federal law makes it a crime to knowingly or intentionally "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). Additionally, it is a crime to "attempt[] or conspire[] to commit any offense defined in this subchapter." 21 U.S.C. § 846. A defendant convicted under § 846 "shall be subject to the same penalties as those prescribed for the offense . . . ." Id.

    3. Impossibility Defense

A common feature of sting operations is that the object of a conspiracy—such as drugs or other contraband—never exists in fact. However, "inability [to commit a crime] due to frustrated efforts, factual impossibilities or unforeseen circumstances does not defeat the inference of an agreement to produce contested amounts of narcotics." United States v. Hendrickson, 26 F.3d 321, 337 (2d Cir. 1994). "[T]he failure to produce is relevant only to the extent it suggests an absence of intent or agreement." Id. Factual impossibility is "irrelevant"; "the 'reasonable capability' analysis 'looks to whether a defendant would have been able to consummate a

6

narcotics transaction if the facts were as he believed them to be.'" Id. (quoting United States v. Howard, 998 F.2d 42, 51 (2d Cir. 1993).

###### 4. Void for Vagueness Doctrine and Johnson

In 2015, the Supreme Court held that the residual clause of the Armed Career Criminal Act ("ACCA") violates the Constitution's guarantee of due process because it is unconstitutionally vague. Johnson v. United States, 135 S. Ct. 2551 (2015). The clause at issue defined "violent felony" to include any felony that "otherwise involves conduct that presents a serious potential risk of physical injury to another." Id. at 2555 (quoting 18 U.S.C. § 924(e)(2)(B)). The Court determined that the "indeterminacy of the wide-ranging inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges." Id. at 2557. If a statute is held to be void for vagueness, then a criminal defendant may have his or her conviction overturned. See, e.g., id.

### B. Discussion

Several of Borrero's alleged grounds for relief rest on the fact that his conviction rests upon a sting operation involving heroin but that, in reality, no heroin ever existed. According to Borrero, this lack of a "real" narcotic necessitates a conclusion that the government manufactured jurisdiction. In addition, he asserts that in all events, 21 U.S.C. §§ 841 and 846 are void for vagueness under Johnson. Borrero's claims are without merit. Read in the light most favorable to petitioner, his claims essentially amount to an impossibility defense: because the heroin never existed, Borrero claims, the government should not be able to prosecute him.

7

1. Impossibility Defense

When a defendant is accused of a crime, factual impossibility is irrelevant, and thus not a defense. Instead, the Court determines whether the defendant would have been able to commit the crime if the facts were as he believed they were. Hendrickson, 26 F.3d at 337. Here, the facts demonstrated that Borrero was part of a conspiracy. If the facts had been as Borrero expected just before he was arrested, he would have robbed the purported narcotics traffickers. It was the "absence of drugs, not the lack of intent or an agreement among the co-conspirators, [that] precluded the defendant from realizing his plan." Id. at 337. Further, Borrero was convicted of conspiracy to possess with intent to distribute heroin—whether or not the heroin existed is irrelevant. Thus, even if it were an option, he could not support an impossibility defense.

2. Manufactured Jurisdiction

Nor can Borrero support a claim that the Government "manufactured jurisdiction." A sting operation is not impermissible manufacturing, as it does not add an element to the crime to federalize it, when that element would not have existed without the Government's intervention. Borrero points to United States v. Archer, 486 F.2d 670 (2d Cir. 1973), for support, but this case is inapposite. There, the conviction was overturned because federal agents provoked interstate phone calls to "set up a federal crime, [going] beyond any proper prosecutorial role and needlessly inject[ing] the Federal Government into a matter of state concern." Archer, 486 F.3d at 672. Here, the crimes Borrero committed—conspiracy to

8

possess and distribute narcotics, conspiracy to commit Hobbs Act robbery, and use or carry of a firearm—were themselves federal crimes. In fact, the <u>Archer</u> Court distinguished cases similar to Borrero's. <u>See</u> <u>Archer</u>, 486 F.3d at 677 (noting that the federal agents' activity was "substantially more offensive than the common cases where government agents induce the sale of narcotics in order to make drug arrests."). The Government did not manufacture some interstate element to an otherwise wholly local crime in order to create federal jurisdiction—nor did it need to. As such, the Government did not manufacture its jurisdiction.

### 3. <u>Void for Vagueness</u>

Finally, Borrero uses the absence of any drugs in fact to claim that 21 U.S.C. §§ 841 and 846 are void for vagueness under <u>Johnson</u>. However, neither statute denies a defendant fair notice or is subject to arbitrary enforcement. Rather, § 841 is specific, and § 846, which criminalizes conspiracy to violate § 841, benefits from § 841's specificity. Together, the statutes clearly delineate possession of controlled specific amount of specific controlled substances as crimes, and they provide specific sentencing minimums. There can be no valid argument that Borrero had no notice that his actions were unlawful.

\* \* \*

For the foregoing reasons, the fact that the offense conduct here was in response to a sting operation, and thus no heroin actually existed, is not a valid argument against Borrero's conviction.

9

III. INEFFECTIVE ASSISTANCE OF COUNSEL

A. Legal Principles

1. Ineffective Assistance of Counsel

To prevail on a claim of ineffective assistance of counsel, Borrero "must [first] show that counsel's representation fell below an objective standard of reasonableness," as measured against "prevailing professional norms." Strickland v. Washington, 466 U.S. 668, 688 (1984). In addition, petitioner must demonstrate that counsel's "deficient performance prejudiced the defense," id. at 687, meaning that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694.

As to the first prong of Strickland, attorney conduct is subject to an objective standard of reasonableness, and is accorded deference in light of the "range of legitimate decisions" that accompanies the various circumstances encountered by counsel. Id. at 688-89. As a result, reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, bearing in mind that there are countless ways to provide effective assistance in any given case and that even the best criminal defense attorneys would not defend a particular client in the same way." United States v. Aguirre, 912 F.2d 555, 560 (2d Cir. 1990) (alterations and internal quotation marks omitted) (quoting Strickland, 466 U.S. at 689).

As to the second prong of Strickland, a petitioner must show that, but for his or her attorney's deficient performance, there is a reasonable probability that the

result would have been different.  Strickland, 466 U.S. at 694.  More is required than a mere showing "that the errors had some conceivable effect on the outcome of the proceeding," as "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." Id. at 693.

Under Strickland, "strategic choices made [by counsel] after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. 466 U.S. at 690–91.  "Actions or omissions by counsel that 'might be considered sound trial strategy' do not constitute ineffective assistance." Henry v. Poole, 409 F.3d 48, 63 (2d Cir. 2005) (quoting Strickland, 466 U.S. at 689).  A "lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision." Greiner v. Wells, 417 F.3d 305, 319 (2d Cir. 2005) (quoting DeLuca v. Lord, 77 F.3d 578, 588 n.3 (2d Cir. 1996)).  "The likelihood that an affirmative defense will be successful at trial and an assessment of the probable increase or reduction in sentence relative to the plea if the defendant proceeds to trial are clearly relevant to the determination of whether an attorney acted competently in recommending a plea." Panuccio v. Kelly, 927 F.2d 106, 109 (2d Cir. 1991).

2. Entrapment

To successfully assert an entrapment defense, a defendant must demonstrate, by a preponderance of the evidence, "(1) government inducement of the crime, and (2) lack of predisposition on the defendant's part." United States v. Bala, 236 F.3d 87, 94 (2d Cir. 2000) (quoting United States v. Salerno, 66 F.3d 544, 547 (2d Cir. 1995)). "A defendant is predisposed to commit a crime if he is 'ready and willing without persuasion' to commit the crime charged and 'awaiting any propitious opportunity' to do so." Salerno, 66 F.3d at 547 (quoting United States v. Harvey, 991 F.2d 981, 992 (2d Cir. 1993)). Predisposition may be shown by evidence of "(1) an existing course of criminal conduct similar to the crime for which [the defendant] is charged, (2) an already formed design on the part of the accused to commit the crime for which he is charged, or (3) a willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement." Salerno, 66 F.3d at 548 (quoting United States v. Valencia, 645 F.2d 1158, 1167 (2d Cir. 1980)).

B. Discussion

Borrero claims that his counsel was ineffective for two reasons: (1) he failed to advise Borrero on affirmative defenses, namely, entrapment; and (2) he failed to call Julio Camacho as a witness.[2] The Court addresses each in turn.

---

[2] Borrero also claims that, in the event any of his grounds for habeas relief are valid but were not raised at an earlier juncture in the proceeding, his counsel was ineffective for failing to raise and/or preserve issues. (Mot. at 11.) This claim is moot, as the Court holds that Borrero has no grounds for habeas relief.

1. <u>Entrapment</u>

Borrero's attorney did not provide ineffective assistance of counsel if he failed to assert or inform Borrero of an entrapment defense. Whether he informed Borrero of such defense or not is ultimately irrelevant. An entrapment or coercion defense was not supported by the evidence.

Borrero claims that he was not "prowling for a robbery to commit or looking for any drugs to sell." (Mot. at 9.) Rather, he was "pulled into a criminal scheme manufactured [sic] and controlled entirely by the federal government through its own agents." (Mot. at 9.) (<u>Id.</u>) As such, he claims, there was "no plausible justification for counsel to have not at least put the option of an entrapment defense on the table for Petitioner to consider . . . ." (<u>Id.</u>)

First, assuming <u>arguendo</u> that Borrero's counsel decided not to pursue an entrapment or coercion defense and not to inform Borrero of the same, these decisions were reasonable given the record in this case and the low likelihood of success for asserting such a defense. The record in this case demonstrates that Borrero was a member of the robbery crew—he was not only found in a car with Julio Camacho on the way to the robbery, but he also spoke with both Camachos over two hundred times in the three weeks leading up to the robbery. As a result, it was reasonable for Borrero's counsel to conclude that his client had shown "a willingness to commit the crime" as demonstrated by a "ready response to the inducement." <u>Salerno</u>, 66 F.3d at 548.

13

Decisions by Borrero's counsel not to inform Borrero of the defense's availability when counseling him on whether to plea thus survive Strickland, especially in light of the fact that the entrapment defense is risky and rarely successful. See, e.g., United States v. Balis, Nos. 08-cv-5637, 03-cr-1028, 2009 WL 1117274, at *6 (S.D.N.Y. Apr. 24, 2009) (noting that the entrapment defense is risky because it "in effect admits that the defendant engaged in criminal conduct, and attempts to explain away the commission of criminal acts," and generally "dilute[s] the force of a denial of wrongdoing").

In any event, even assuming Borrero were able to show that his attorney's conduct was somehow deficient, he fails to show that he suffered prejudice as required under Strickland. "[W]here the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985). As explained above, in light of the record here, it is unlikely that Borrero would have been entitled to a jury instruction on entrapment, let alone that he would have succeeded on an entrapment defense at trial.

In sum, Borrero's counsel did not provide ineffective assistance of counsel by failing to inform Borrero of an entrapment defense when recommending that he plead guilty.[3]

---

[3] Moreover, it is worth noting that there is "no hint in the record that [defendant], well represented by a competent attorney, was unaware that entrapment or coercion could be used as a defense." United States v. Michaelson, 552 F.2d 472, 475–76 (2d Cir. 1977).

2. Failure to Call Julio Camacho

Borrero also argues that his counsel's failure to call Julio Camacho as a witness constituted ineffective assistance. At trial, Victor Moral—the driver in Javion Camacho's car—stated that Julio Camacho had told Moral that Borrero was a "wild boy" who "gets busy." (Mot. at 10.) Borrero argues that because the Second Circuit acknowledged that those statements were prejudicial and important to the Government's case, it is "beyond dispute that the statements . . . were very impactful in the government's favor," so "trial counsel should have sought to refute the testimony . . . by calling Camacho as a witness." (Id.) See also United States v. Camacho, 630 Fed. App'x 20, 23 (2d Cir. 2015).

However, "counsel's decision as to 'whether to call specific witnesses . . . is ordinarily not viewed as a lapse in professional representation.'" United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000) (quoting United States v. Schmidt, 105 F.3d 82, 90 (2d Cir. 1997). While calling Julio Camacho as a witness may have served the purpose Borrero wishes, it may also have led to detrimental testimony—if, for example, Julio Camacho corroborated Moral's testimony. As such, it is not clear that counsel's failure to call Julio Camacho was unreasonable.

IV. CONCLUSION

For the reasons set forth above, petitioner's § 2255 motion to vacate, set aside or correct his sentence is DENIED. The Court declines to issue a certificate of appealability, as Borrero has not made a substantial showing of a denial of a federal right. See Matthews v. United States, 682 F.3d 180, 185 (2d Cir. 2012). The Clerk of Court is directed to terminate Borrero's petition at 17-cv-2834 ECF No. 1 and 13-cr-58 ECF No. 618 and to terminate 17-cv-2834.

SO ORDERED.

Dated:  New York, New York
January 10, 2018

_____
KATHERINE B. FORREST
United States District Judge

Copy to:
Louis Borrero
No. 67883-054
USP Canaan
U.S. Penitentiary
P.O. Box 300
Waymart, PA 18472